IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| ELLEN ALLICKS, et al., on behalf of themselves and others similarly situated, | ) ) ) |
| Plaintiffs, | ) ) ) |
| vs. | ) ) Case No. 4:19-cv-1038-DGK ) |
| OMNI SPECIALTY PACKAGING, LLC, O'REILLY AUTOMOTIVE STORES, INC., d/b/a O'REILLY AUTO PARTS, and OZARK AUTOMOTIVE DISTRIBUTORS, INC., | ) ) ) ) ) ) |
| Defendants. | ) |

## ORDER DENYING PROPOSED SETTLEMENT

This case is a putative consumer class action lawsuit concerning tractor hydraulic fluid labeled as "303" manufactured and sold by Defendants. Pending before the Court is the Parties' Joint Motion for Preliminary Approval of Proposed Class-Action Settlement (Doc. 6), the proposed class action settlement ("the Settlement") (Doc. 6-1), the Court's Order directing the parties to provide additional information (Doc. 16), and the parties' joint response (Doc. 17).

Although the Settlement has several positive features—most notably, the amount of cash compensation that will go to class members—the Settlement does not meet all of the requirements of Fed. R. Civ. P. 23. The motion for preliminary approval is, therefore, DENIED WITHOUT PREJUDICE. That said, the Court anticipates the parties will be able to fashion a revised settlement that addresses the Court's concerns and will merit approval.

**Background**

In the 1960s, John Deere marketed a high-quality tractor hydraulic fluid ("THF") that became known colloquially as "303." John Deere stopped making this product in the mid-1970s and abandoned the 303 label. Defendants Omni Specialty Packaging, LLC ("Omni"); O'Reilly Automotive Stores, Inc. d/b/a O'Reilly Auto Parts ("O'Reilly"); and Ozark Automotive Distributors, Inc. ("Ozark") (collectively "Defendants"),[1] subsequently began manufacturing and selling a product labeled "O'Reilly 303 Tractor Hydraulic Fluid" that, Plaintiffs allege, does not have the anti-wear and other protective properties for which John Deere's "303" THF was known. Plaintiffs allege Defendants manufactured their THF with poor oils and diluted additives.[2]

Putative class counsel have litigated other cases making similar allegations. They previously litigated a case against Defendants on behalf of a class of Missouri residents, *Miller v. O'Reilly Automotive, Inc. et. al.*, Case No. 4:18-cv-00687-ODS, alleging claims against almost identical to those alleged here.

Two weeks after the district court approved the settlement in *Miller*, putative class counsel filed this case. The named plaintiffs were sixteen individuals from nine different states,[3] some of whom were already named plaintiffs in single-state class-action lawsuits filed in 2019.

---

[1] The Complaint alleges Omni manufactured the THF that O'Reilly and Ozark advertised and sold in their retail stores throughout the United States. Omni's principal place of business is in Northbrook, Illinois. O'Reilly and Ozark's principal place of business is in Springfield, Missouri.

[2] Because there is no specification to label something as "303," any company can label its THF as 303. Eventually several states, including Missouri, began banning the labeling of THF as "303," and several class-action lawsuits were filed against companies who sold THF labeled 303.

[3] Alabama, Arkansas, Georgia, Iowa, Kansas, Kentucky, Missouri, Texas, and West Virginia. The Missouri plaintiffs allege they purchased the O'Reilly's 303 THF in Kansas, which the Missouri Settlement did not cover.

Three months after this case began, the parties filed the pending motion for preliminary approval of a nationwide settlement. The parties also began transferring the individual state class actions to this district for consolidation.

This case was originally assigned to the judge in the *Miller* case. When that judge retired, this case was reassigned to the undersigned.

I. **Summary of the Settlement's Terms**

   A. **The Settlement Class**

The Settlement creates a nationwide (excepting Missouri) Settlement Class; it defines the Settlement Class as "[a]ll persons and other entities who purchased O'Reilly 303 Tractor Hydraulic Fluid during the Class Period . . . in the United States, excluding purchases made in Missouri, and also excluding purchases made for resale." It defines the Class Period as

> the time period established by the longest applicable statute of limitations available under the law of the state in which a unit of O'Reilly 303 Tractor Hydraulic Fluid is purchased, with respect to claims for breach of warranty, fraud, unjust enrichment, personal property damage, and for violation of any applicable consumer protection statute. The 'Class Period' for each state in which O'Reilly 303 Tractor Hydraulic Fluid was purchased, excluding Missouri, is set forth in Appendix A[4] hereto.

Settlement ¶ 6.

The parties estimate the size of the Settlement Class to be approximately 285,000 persons and entities. Approximately 168,000 members of the Settlement Class reside in seven states (Alabama, Arkansas, California, Mississippi, Oklahoma, Tennessee, and Texas), and these members account for an estimated fifty-nine percent of the total settlement claim amounts.

---

[4] Appendix A has information for forty-six states. Missouri is not covered by the Settlement, and it appears that O'Reilly has no stores in Delaware, Maryland, or New Jersey.

### B. The Settlement's Benefits

The Settlement creates a $8,501,361.10 settlement fund from which all claims will be paid, as well as settlement costs and tax costs. Settlement ¶¶ 36, 51, 83. This amount is equal to thirty-three percent of the "total net sales"[5] of O'Reilly 303 THF sold in the United States, other than Missouri, during the Class Period. Suggestions in Supp. of Prelim. Approval (Doc. 7) at 10.

To determine each class member's distribution amount, the Settlement places the member in one of three categories, and then calculates an estimated minimum payment of either 30.51%, 38%, or 41% of the net sales price paid by the class member during the Class Period. Placement in these categories is determined by a combination of factors that impact the strength of the class member's claims and available damages. These factors include whether the state where the product was purchased has a consumer-protection statute allowing recovery or relies on common law; and if it does have a consumer-protection statute, what it provides for, that is, whether it allows for class actions, recovery of double or triple damages, etc. Other factors include the applicable statute of limitations for the common law or the consumer-protection statute, and whether the class member purchased the THF during the applicable statute of limitations period. Settlement ¶ 74, App. A.

Once an estimated minimum payment for each class member is determined, tax and tax-related expenses will be calculated and deducted from the settlement fund. Settlement ¶ 83. Next, the Settlement Administrator's fees, costs, and expenses (which are estimated to be

---

[5] "Net sales" is the sum of all dollar amounts actually paid, not including taxes, after any rebates or returns. The net sale amount for any given purchase might differ from another sale for an identical amount of product because of the state in which the sale was made (maybe prices are cheaper in Alabama than New York), or if the product was on sale at the time.

$476,000) will be paid from the settlement fund.[6]  Settlement ¶ 51.  If there is any money left over, each class member will receive a pro rata increase in the distribution amount.  Settlement ¶ 75.

The parties estimate that under the Settlement, the maximum settlement payment will be approximately $18,610; the average settlement payment (the total settlement fund divided by the estimated number of class members) will be approximately $30; the estimated mode settlement payment (the most frequently occurring settlement payment) will be approximately $14; and the smallest amount will be $0.07.  Joint Resp. to Order Concerning Proposed Settlement ("Joint Resp.") (Doc. 17) at 5.  Less than 0.02% of class members are expected to receive payments of less than $1.00.[7]  *Id.*

Checks will be mailed to class members between forty-five and seventy-five days after the Court enters its final approval order.[8]  Settlement ¶ 73.

After the deadline to cash settlement checks has passed, any money remaining in the settlement fund will be paid to the cy pres recipient, Legal Aid of Western Missouri, or another cy pres recipient agreed upon by the parties and approved by the Court.  Settlement ¶ 79.  The Settlement has no reversion provision, other than the provision allowing Defendants to recoup payment of the Settlement Administrator's fees, costs, and expenses from the fund.  Settlement ¶ 51.

---

[6] If there is not enough money remaining in the fund to pay taxes and tax-related costs or the Settlement Administrator's fees, costs, and expenses exceed the remaining balance, Defendants shall pay these amounts.  Settlement ¶¶ 51–50, 83.

[7] The parties estimate that 1.7% of the class will receive no payment at all, because the net price paid was $0.00, or they already received a full refund for THF purchased during the class period.  Joint Resp. at 5–6.

[8] Paragraph 73 states settlement checks shall be mailed no later than thirty days after the Funding Date.  The Funding Date is ten business days after the Effective Date, which is the date the Final Order and Judgment becomes "final."  "Final" is five business days after thirty days have passed since the entry of the Final Order and Judgment, assuming no appeals are taken.  Settlement ¶ 9(b).

Finally, as part of the Settlement, Defendants also agree to stop selling any THF labeled "303." Settlement ¶ 38.

### C. Attorneys' Fees

Defendants shall pay all attorneys' fees and expenses and the class-representative payments separately from the settlement fund. Defendants agree to pay the sixteen class representatives $5,000 each. Settlement ¶ 37. Defendants agree to pay Plaintiffs' Counsel attorneys' fees not to exceed $2,105,340.28, and expenses not to exceed $25,000.[9] Settlement ¶¶ 39–40. The attorney fee award would be paid between thirty-five and forty-five days[10] after the Court issues its final approval order. Settlement ¶ 40.

### D. Notification Provisions

Notice of the Settlement will be provided to class members in primarily three ways:

**1. Direct Notice by U.S. Mail and Email.** The Settlement Administrator will directly mail notice to those class members whose mailing addresses are known, which is about 181,200 members. If the first directly mailed notice is returned as undeliverable, the Settlement Administrator will search for an updated address and then send a second mailing to the class member. There is no third mailing.

The direct notice provision also provides for email notice. The Settlement Administrator will email those class members for whom an email address is known, about 8,400 additional members. Settlement ¶¶ 54–58. The parties' filings do not contain any information about any

---

[9] Although the parties describe the attorneys' fee as 25% of the settlement amount, these fees and expenses are actually slightly more, about 26.6% of the settlement fund after deducting the Settlement Administrator's costs.

[10] Paragraph 40 provides payment shall be made within ten business days from the Effective Date. The Effective Date is date the Final Order and Judgment becomes "final," meaning five business days after thirty days have passed since the entry of the Final Order and Judgment, assuming no appeals are taken. Settlement ¶ 9(b).

precautions that will be taken to ensure that these emails will not be caught in spam filters or other strategies that will be employed to ensure the class members actually see and read these emails.

The Settlement Administrator estimates this direct notice will reach 189,600 class members who are responsible for approximately 78% of the total claims amount/total sales. Wickersham Aff. (Doc. 6-3) ¶¶ 9–16.

The Settlement Administrator will attempt to reach the 96,000 estimated remaining class members through the remaining two methods.

2. **Notice by Publication.** Notice will be published once in three national publications and seven state publications targeted to farmers and the agricultural community.[11] The state publications are targeted at class members residing in Alabama, Arkansas, California, Mississippi, Oklahoma, Tennessee, Oklahoma, California, and Texas—states with higher volumes of O'Reilly 303 THF sales. Settlement ¶ 61; Wickersham Aff. (Doc. 6-3) ¶¶ 19–21. The notice will provide basic information about the lawsuit and Settlement, and it will direct readers to a website that has more detailed information and documents, including claim forms.

The reach of these notices is uncertain; the Settlement Administrator estimates a "reach" of 2.3 million. The font for several of these notices is quite small, between seven and nine point.

3. **Posting Notice in Stores.** Although not written into the Settlement, after consulting the Settlement Administrator, the parties have agreed that O'Reilly will post notice of the Settlement for 90 days in 1,614 of its 5,128 stores. Sales in these stores account for eighty

---

[11] The national publications are Successful Farming, Farm Journal, and Progressive Farmer. The state publications are Alabama Farm Bureau Neighbors, Arkansas Agriculture, California Farm Bureau Agriculture Alert, Mississippi Farm Country, Tennessee Farm Bureau, Oklahoma Farm Bureau Country, and Texas Agriculture.

percent of both the total claim amount under the Settlement and O'Reilly 303 THF sales to class members.[12]  Settlement ¶ 61, Wickersham Aff. ¶¶ 24–26.

Finally, the Settlement does not make any provision for providing notice in Spanish.

Neither the parties nor the Settlement Administrator estimate the total number of class members who will receive notification of the Settlement by at least one of the above methods.  The Court anticipates that direct notice will reach approximately 189,600 of the 285,000 member class, but far fewer class members will receive notice via publication or by notice in stores.  That said, at least sixty-six percent of the class should receive notice of the settlement.

### E. Claims Procedures

Class members for whom Defendants possess purchase information are not required to submit a claim to receive payment.  These class members will receive direct notice of the settlement and a payment without having to fill out any paperwork.  If purchase information is not available, or if a class member wishes to be compensated for property damage caused by the 303 THF, then the class member must submit a claim to receive a payment.

### F. Opt-out Procedure

Putative class members wishing to opt out of the Settlement must send a written request to be excluded from the Settlement to the Settlement Administrator by fax, U.S. Mail, e-mail, or electronically via the settlement website.  This request must include the member's name, address, and telephone number, and provide a clear statement communicating the election to be excluded from the settlement class, wish to not be a class member, and election to be excluded from any judgment entered pursuant to the Settlement.  This request must be postmarked on or before the

---

[12] No notice will be posted in any stores in nine states/territories (Connecticut, the District of Columbia, Delaware, Maryland, New Jersey, Pennsylvania, Puerto Rico, Rhode Island, West Virginia) where the total amount of THF sold was only one percent of the amount covered by the Settlement (Doc. 17 at 26–28).

Bar Date (a date set by the Court), which the parties suggest being 150 days after the date notice is sent out.  Settlement ¶¶ 87–88.

If 2,000 or more class members opt-out, Defendants may elect to rescind the Settlement. Settlement ¶ 91.

### G. Objection Procedures

Any class members who wish to object to the fairness, reasonableness, or adequacy of the Settlement must:  (1) provide the information required on the claim form, including purchase information for the objector's O'Reilly 303 Tractor Hydraulic Fluid; (2) sign the objection (or have their lawyer sign it); (3) provide current contact information; (4) state the reasons for objecting; (5) state whether they and/or their counsel intend to appear at the Final Fairness Hearing; (6) include a list of all objections to class-action settlements they and their counsel have engaged in for the last five years; (7) attach all documentation they intend to use in supporting their objection, including the identification of any witnesses the objector intends to call at the final fairness hearing by name, address, and telephone number; and (8) send notice of the objection to the Court, Class Counsel, and Defense Counsel no later than ten business days before the hearing. Settlement ¶¶ 84–86.

An objector intending to appear at the final fairness hearing must file a notice of appearance with the Court at least ten business days prior to the hearing and serve a copy of such notice of appearance on the parties' counsel.  *Id*. at ¶ 86.

As currently written, the Settlement requires a class member to either opt-out or object.  In other words, class members cannot object, and if the objection is not resolved to their satisfaction, choose to opt-out.


### H. Injunction prohibiting putative class members from filing a lawsuit.

The Settlement also states that in the motion for preliminary approval, "Plaintiffs will request that the Court . . . (l) enjoin Plaintiffs and Settlement Class Members, and any of them, from commencing or prosecuting, either directly or indirectly, any action asserting any of the Released Claims, pending the Final Fairness Hearing." Settlement ¶ 34(l). That is, the Settlement requires Plaintiffs to request that the Court enjoin a putative class member who has not yet received notice of this lawsuit from filing his, her, or its own lawsuit.

### Analysis

The Settlement contains many positive provisions, including the amount of compensation provided, but also a few concerning ones discussed below. The Court encourages the parties to submit a revised settlement that addresses the Court's concerns.

### I. The proposed notice is not the best practicable under the circumstances.

Federal Rule of Civil Procedure 23(c)(2) requires notice to be the "best notice that is practicable under the circumstances." This notice must "clearly and precisely state in plain, easily understood language" the nature of the action; the class definition; the claims, issues, or defenses; the ability of class members to enter an appearance through an attorney if desired; that they may request exclusion and be excluded, as well as the time and manner of doing so; and the binding effect of a judgment on class members. *Id.*

It is reasonable to expect an effective notice campaign to reach between seventy and ninety-five percent of a class. *See* Federal Judicial Center, *Judges' Class Action Notice and Claims Process Checklist and Plain Language Guide*, 3 (2010), https://www.fjc.gov/content/judges-class-action-notice-and-claims-process-checklist-and-plain-language-guide-0. Currently, the direct notification provisions of the settlement anticipate reaching a sixty-six percent of the class and

seventy-eight percent of the total claim amount/total sales. The Court believes the parties can craft a notice plan that will reach substantially more class members with minimal marginal expense.

The Court has the following concerns about the proposed notice.

### A. The Court cannot tell whether it includes precautions to ensure that it will not be caught in spam filters and that the recipient will open it.

Currently, the Court has no information regarding email notification, other than the expectation of occurrence; and emails that are never seen because they are ignored, discarded, or caught in a filter do not serve their purpose.

### B. Notice is not being posted in all stores.

The parties defend the decision not to post notice in all stores by suggesting: (1) posting notice in all stores would be duplicative; (2) the 1,614 stores selected for posting account for 80% of the total claim amount and THF sales to the settlement class; (3) there is a "meaningful increase in cost associated" with posting and maintaining notice in the additional stores, including the cost of "printing the requisite flyers," but the parties do not identify what the marginal expense is; and (4) "[e]xpanding in-store notice also creates a risk of harm to O'Reilly's brand and reputation." Joint Resp. at 13.

The Court is not persuaded. While posting notice in all stores may result in duplicative notice for some class members, particularly those receiving direct notice by U.S. Mail, the goal is for as many class members as reasonably possible to receive notice—even if that means duplicative notification for some. Posting notice in the thirty-one percent of stores that account for eighty percent of both the total claim amount and sales to class members may be the most efficient way of posting notice in stores (that is, the most class members will see the notice via the fewest number of posters in stores). But it also means many class members will not see the posting,

because notice will not be posted in many stores in states where relatively large amounts of THF were sold.

### C. There is no Spanish-language notification.

Finally, the Settlement makes no provision for providing notice in Spanish. Given that a large number of sales occurred in Texas and California, and the agricultural community is the audience, notification in English alone is probably not sufficient. Because the demographics of the settlement class are not known, however, it is unknown how many class members would benefit from notification in Spanish.

That said, the parties agree that "posting Spanish-language notice of the settlement on the Settlement Website and in select O'Reilly stores could potentially be a cost-effective method of providing notice to any Spanish-speaking members" of the class. Joint Resp. at 8. The parties also suggest they could add language to the notice in print publications advising readers that additional information and claim forms are available in Spanish on the Settlement Website.

## II. The amount of attorneys' fees is reasonable, but payment should be made in installments.

The amount of attorneys' fees and expenses agreed to by the parties, $2,130,340.28, is not unreasonable; however, the Court has concerns about the timing of the payments. To ensure that Class Counsel has a financial incentive to remain responsive to the class members' phone calls for the duration of the litigation, the Court will likely withhold $100,000, approximately 5% of the total fees and expenses, until after their clients have received their settlement checks, the deadline to cash the checks has expired, and the Settlement Administrator files a final report.

### III. The proposed dates for objecting and opting-out are problematic, and the procedures to object or opt-out are more onerous than necessary.

The procedure and dates proposed by the parties for objecting and opting-out are problematic because they do not allow a class member to object and, if the concern is not addressed to the member's satisfaction, opt out. This effectively discourages class members who dislike some aspect of the Settlement from objecting, since if they object and the Court does not resolve the objection to their satisfaction, they cannot opt-out. But objections are not to be discouraged, as they perform a useful role in the approval process by bringing deficiencies of a proposed settlement to the Court's attention. *See generally* Manual for Complex Litigation, Fourth, § 21.63 (2004).

The parties defend this provision by arguing that objecting and opting out are "mutually exclusive," and that "opting out destroys the standing a class member needs in order to object." Joint Resp. at 5. While there is arguably some caselaw supporting this position, it is a minority position. There is no requirement that they be mutually exclusive. Instead, the settlement should allow any class members who wish to object to do so, learn the Court's ruling on the objection, and then determine whether they wish to opt out. This requires setting different deadlines for objecting and opting out, and potentially holding a preliminary fairness hearing.

Additionally, the requirements to object are more onerous than necessary.[13] To object, a class member must: (1) provide purchase information of any O'Reilly 303 Tractor Hydraulic Fluid; (2) sign the objection (or have a lawyer sign it); (3) provide current contact information; (4) include the reasons for objecting; (5) state whether the objector or objector's counsel intends to appear at the Final Fairness Hearing; (6) include a list of all objections to class-action settlements

---

[13] The Court notes the opt-out requirements should not be so stringently enforced such that their practical effect is to make the process of opting out more onerous than necessary or provide a basis on which to void an unwary class member's decision to opt out.

the objector any her counsel have made in the last five years; (7) attach all documentation they intend to use in supporting their objection, including the identification of any witnesses; and (8) send notice of the objection to the Court, Class Counsel, and Defense Counsel no later than ten business days before the preliminary hearing.  The Court finds some of these requirements to be unnecessary and designed to discourage objections.  Filing an objection with the Court is a public record and would be sufficient.  The amended settlement should strive to streamline the requirements to object and opt out.

**IV.     The injunction provision is unnecessary.**

The Settlement requires that once the Court approves the Settlement, Plaintiffs must request an injunction enjoining Settlement Class Members from "commencing or prosecuting, either directly or indirectly, any action asserting any of the Released Claims, pending the Final Fairness Hearing."  Settlement ¶ 15.

In response to the Court's questions about the purpose of this injunction, the parties answered that they included this language "in the remote chance there is a need to protect the Court's jurisdiction and facilitate an orderly and effective notice and administration process."  Joint Resp. at 15.  To their knowledge, it would not impact any known litigation.  *Id*.  They added that such a provision is not uncommon in class action settlements.  *Id*. at 16.

In response to a question about the Court's power to issue such an injunction, they observed "the source of the Court's power to enter them has not been clearly and uniformly explained in the case law.  That power appears to emanate from the general power of the Court to act in aid of its jurisdiction."  *Id*. at 16.  The parties cite some Eighth Circuit caselaw where such injunctions have been issued, but nothing cited is particularly analogous to this one.[14]

---

[14] The primary case cited by the parties is a district court case in a complex MDL action where the court temporarily enjoined class members from pursuing parallel proceedings during the notice and opt-out periods after finding the

The Court does not anticipate entering such an injunction in this case.

## Conclusion

Although the Settlement has several positive features, the Court declines to approve it in its present form. The Parties' Joint Motion for Preliminary Approval of Proposed Class Action Settlement (Doc. 6) is DENIED WITHOUT PREJUDICE.

**IT IS SO ORDERED.**

Date:  September 22, 2020                    /s/ Greg Kays_____
                                            GREG KAYS, JUDGE
                                            UNITED STATES DISTRICT COURT

---

parallel proceedings, primarily arbitrations, threatened to destroy the utility of the multidistrict forum. *In Re: Centurylink Sales Practices and Sec. Litig.*, MDL No. 17-2795, 2020 WL 869980 at *4–5 (D. Minn. Feb. 21, 2020). In defense of the injunction, the district court noted that its preliminary approval order "set forth an orderly, efficient manner for class members to opt out and, thus, pursue parallel actions, including lawsuits and arbitrations, with little delay," and that it could not efficiently manage the class, which consisted of seventeen million consumers and possibly millions of opt-out requests, without the injunction. *Id.* at 5. The Minnesota district court also cited an Eighth Circuit case, *Liles v. Del Campo*, 350 F.3d 742, 746–47 (8th Cir. 2003), for support. In *Liles* the Eighth Circuit held a district court did not abuse its discretion in enjoining class members from filing related litigation because such litigation threatened to drain the settlement fund which was funded by a $2 million "wasting" policy (a policy drawn down by defense and litigation costs), and the cost of the parallel litigation threatened to drain the fund completely.